UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHRISTOPHER FAETH,

                Petitioner,                **DECISION AND ORDER**

    -vs-                              **No. 03-CV-0924(VEB)**

JAMES CONWAY, Superintendent,

                Respondent.

_____

## I.    Introduction

*Pro se* petitioner Christopher Faeth ("Faeth" or "petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a state court judgment convicting him of depraved indifference murder and forcible robbery. *See* Docket No. 1. The parties consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). After respondent answered the petition, Faeth moved for and was granted permission to file an amended petition. *See* Docket No. 29. As a sanction for non-compliance with this Court's scheduling orders directing it to respond to the amended petition, respondent was precluded from filing an answer to the amended petition. Accordingly, the pleadings relevant to this Court's consideration are Faeth's amended petition and respondent's answer to the original petition.

For the reasons that follow, the Court finds that habeas relief is not warranted. Accordingly, the petition is dismissed.

**II.    Factual Background and Procedural History**

**A.    Overview**

Faeth initially was charged in Wayne County Court with three counts of second degree murder under three theories (intentional murder, depraved indifference, felony murder) and first degree (forcible) robbery, in connection with the death of Randolph Markel on the night of August 29, 1999. Faeth and Markel met while both attending an open music festival being held at some camping grounds in Macedon, a rural town in Wayne County. Markel, petitioner, and a number of the witnesses had all been using drugs (crack cocaine and/or marijuana) before and after the incident. Petitioner had been selling crack cocaine to various people and was upset that someone saw him making a drug sale. There was also evidence that he had a verbal confrontation with the victim at some point. It was alleged that Faeth followed Markel into the woods, confronted him, beat him with some kind of blunt object. Faeth then placed the unconscious Markel on some nearby railroad tracks, where he was hit by an oncoming train. When Markel was found, he was still alive but one of his legs had been severed at the thigh by the impact. He subsequently died from his injuries en route to the hospital.

**B.    The Prosecution's Case**

At trial, the prosecution presented testimony from a number of petitioner's friends or acquaintances (Stephanie Nesbitt, Ron Alessi, Bobbe Hackett, and Lewis Hackett) who had been with him at the festival and had seen him with the decedent at various times. Several of these witnesses also testified to admissions that petitioner had made to them that he had killed Markel.

Nesbitt was romantically involved with petitioner in July and August 1999; the last time she saw him was the night of the murder. She, along with petitioner, Bobbe Hackett, Lewis

-2-

Hackett, Ron Alessi, and several other friends, attended the music festival and had a campsite together. Between 5 p.m. and 1:30 a.m., she and petitioner bought and smoked crack cocaine on a number of occasions. *See* T.227-31, 202-03, 230, 203-06, 231, 246-49. Nesbitt also saw Faeth sell crack cocaine all night. T.210, 235, 245-46, 289-90. Faeth made $20-sales of crack to 6 to 10 people that evening. *See id.*

Nesbitt did not know the decedent, but she did see him at the festival. He appeared to be intoxicated and was acting "very happy" and sociable. She did not see petitioner and decedent together that night.

Bobbe Hackett was another heavy user of crack cocaine. In the past, she had purchased crack from petitioner and also had been given crack for free by him. T.419-20, 485-86. She testified consistently with Nesbitt about their group's multiple purchases of crack cocaine and their drug-use throughout the evening. *See* T.376, 385, 447-49, 460-61.

Bobbe testified that sometime before midnight, she met the victim for the first time. T.378-79, 465-66. He was intoxicated, and they nicknamed him "the happy guy." T.379, 433, 486; *see also* T.501. Bobbe did not do any drugs with the victim, whom she saw three or four more times that night. At around 12:15 a.m., Bobbe saw the victim speaking with petitioner. T.380. She overheard petitioner say to him, "Fuck you." *Id.* The victim replied, "No, I don't like liars." T.380. The victim then walked away. *Id.*

Ten to twenty minutes after that exchange, Bobbe heard petitioner say, "I am going to get firewood," and saw him walk into the woods with a flashlight. T.382. Bobbe heard the sound of what she described as animals wrestling around with each other about ten minutes after petitioner went into the woods, and saw a flashlight move from left to right. T.382, 488.

However, Bobbe did not hear anyone say anything. T.383, 489-90. Like Bobbe, Nesbitt heard rustling in the woods that sounded as if people or animals were wrestling around. T.214-17, 293. Nesbitt also saw a flashlight moving back and forth from one side of the trail to the other. T.214-17, 283, 285-86.

Bobbe testified that petitioner was gone for about fifteen to twenty minutes; he returned to the campsite about five minutes after she heard the rustling noises. T.382-84. Bobbe and Nesbitt recalled that petitioner was carrying what appeared to be bushes or a small tree, and appeared to be pumped up from adrenaline; he roared as he threw the tree onto the campfire. T.384, 487, 217-18, 310. When petitioner came back, Nesbitt said, he did not have the black and yellow flashlight that he had when he went into the woods. T.306. Nesbitt asked petitioner why he was smiling, and petitioner said that he would tell her later. T.217.

Bobbe's brother, Lewis Hackett, also saw petitioner with decedent that night. He was sitting around at the campsite with Bobbe and Alessi when petitioner went into the woods by himself. T.511. Lewis recalled that petitioner announced, "I got to do the deed" before he walked into the woods. *Id.* About twenty minutes later, petitioner returned, carrying a small tree. As he threw the tree onto the fire Lewis said that petitioner roared like a lion, as if he was all pumped up full of energy. T.512.

Ron Alessi was a longtime user of drugs, including marijuana and crack cocaine, and had a criminal history of theft offenses and drug crimes. He attended the festival with Nesbitt, petitioner, Bobbe, and the others. Alessi bought and smoked crack cocaine with petitioner on a number of occasions at the festival, and gave marijuana to petitioner as well. T.321-22, 324-25, 329, 334-, 349, 361. Alessi also saw petitioner make a $20-sale of crack cocaine. T.328-330.

Sometime between midnight and 1 a..m., Alessi met the victim at the festival, and they smoked marijuana together. T.330-31, 347, 356. According to Alessi, the victim kept his marijuana in his front pocket, packaged in small, clear bags "pillow bags" that were white on top. T.331-32. When the victim pulled the drugs out from his front pocket, Alessi observed that he also pulled out cash. T.332.

Alessi also observed petitioner and the victim talking together for about five minutes. T.334-47. This was just around the time that petitioner went into the woods for the first time T.335-36. Alessi recalled that petitioner made several trips to get firewood. The last time, which was before the train stopped, petitioner said that "it was time to do the deed." T.404-05. Petitioner took a flashlight with him, which Alessi thought was black and yellow. T.356. Alessi also recalled that petitioner "throwing a tree into the fire and yelling something" when he returned from the woods. T.334-35.

Alessi testified that when petitioner returned with the firewood, he saw that petitioner had marijuana packaged in a"pillow bags" with a white top, similar to what he had seen in the victim's possession earlier. T.338. Alessi said that it was not the same marijuana he had given to petitioner. T.338. Alessi did not ask petitioner where he had gotten it.

Bobbe, Lewis Hackett, and Nesbitt all recalled hearing the train stop at around 5:30 a.m., and someone who had been walking along the tracks ran up and said that a person had been hit by the train and his leg was gone. T.517-18; *see also* T.388, 218-220. Petitioner asked, "What did you find, a body up there?" T.388.

Upon hearing of the accident, Lewis and Alessi were going to walk up to the tracks to see if they could help, but petitioner began yelling that he wanted to leave because the police were

coming. T.517-18. Lewis said that petitioner was urging Bobbe to leave, saying, "Let's go, let's go." T.517-18; T.388. Bobbe testified that petitioner appeared frantic and wanted to go immediately. T.389. People were yelling that the police were coming. T.342. Bobbe, Nesbitt, Alessi, and petitioner left together shortly thereafter and went back to Bobbe's house. T.518-19; T. 388-89.

Nesbitt testified that when the person ran up and announced there was a body on the tracks, petitioner turned to her and said, "I killed him." T.218-20, 280, 283. She replied, "What do you mean, you killed him?" *Id.* Petitioner said, "I killed the happy guy," which was the nickname their group had given to Markel because he appeared so happy at the festival. T.219. No one else heard petitioner make this admission to her. Petitioner told Nesbitt that he knocked the victim out, threw him on the train tracks, and took $100 and some marijuana from him. T.218-20. According to Nesbitt, petitioner said that he killed Markel because Markel had seen him make a drug deal. T.218-20.

Nobody in petitioner's group went up to see the body on the tracks. Alessi testified that when they were at Bobbe's house, petitioner told him that Nesbitt "was mad at him because she thought that he was the one that punched the guy out and put him on the tracks." T.340, 360. He also saw that petitioner had about $80 in $20-bills. T.340, 359.

Bobbe testified that at about 6:30 a.m., she went to a convenience store. T.390. When she returned, she asked petitioner why he did not want her to go up to the tracks. He replied that she "didn't need to see what [he] did back there." T.390-91. Not wanting to upset petitioner, Bobbe commented that he had committed the perfect crime. Petitioner told her that it must have been "the happy guy" or a person named Ben who had gotten hit. T.440-41, 486. When Bobbe asked

petitioner how he knew it was "the happy guy," petitioner "smirked." T.391, 486. Nesbitt asked petitioner if that bothered him at all. T.394. Petitioner laughed and said, "Yeah, it is just tearing me up." T.221-22, 276.

Ryan Howie was the person who discovered the body. Howie also had attended the festival but was unacquainted with petitioner and his group. Howie was walking along the railroad tracks and heard some gasping noises that "didn't sound right" coming from the near the tracks. T. 561-562. Walking closer to the sound, he discovered the victim's body lying face up between the railroad tracks. T.563. He noticed that the victim's leg had been severed, but he did not see the leg. T. 563-564. According to Howie, the victim was conscious but was "pretty much dying." T. 564. Howie got one of his friends to help him move the body off the tracks. He ran back to the camping area yelling for a cell phone; however, no one could give him one, so he ran to a gas station to call for help.

David Kelly, one of the individuals from the rescue squad, testified that when he arrived at the scene, the victim was still alive. T.494, 499. By the time they arrived at the hospital at 6:27 a.m., Kelly stated, the victim was dead. T.496-97.

Investigator Robert Hetzke ("Inv. Hetzke") testified regarding his investigation of the crime scene. *See* T.603-80. In particular, the bushes, trees and weeds adjacent to the train tracks were matted down as if some weight had been carried over them. T.608-09. The vegetation was only matted in the general direction heading toward the tracks. T.652-665-66. Inv. Hetzke testified that the appearance of the matted area was consistent with a body having been dragged through it. T.668. Inv. Hetzke found a flashlight head, which was dark green or black in color; a flashlight battery; and a broken flashlight reflector all in the same vicinity. None of these pieces

were positive for fingerprints, and they could not find the rest of the flashlight. T.660, 671. Inv. Hetzke stated that the police never recovered a possible murder weapon.

The prosecution's medical witness, the Monroe County deputy medical examiner, testified that Markel was pronounced dead at the emergency room but that he had no vital signs during the twenty-mile ambulance ride transporting him to the hospital. T.535. The victim had suffered a traumatic amputation of the right leg, which was completely severed just above the knee. *Id.* At 535-36. His upper and lower jaw were fractured, and one of his teeth was protruding through the skin of the lip on the right side of the face. He had multiple scratches and abrasions, including several large skin flaps hanging off the side of his body. T. 536-537. The victim had grease and oil on his face and on his legs both front and back. He also sustained serious head injuries including multiple lacerations to the scalp. Any of the three traumatic injuries–in particular, the rather large, star-shaped wound–would have caused loss of consciousness. The star-shaped, or stellate wound, was more consistent with blunt trauma to the top of the head by an object such as a beer bottle, a stick, or a rock, rather than being struck by a locomotive train engine. T.540-41, 554-55. In other words, if the train had struck the victim's head one would not see the type of star-shaped tearing of the skin that Markel had. Rather, if the train hit the victim's skull with any kind of force, it would have obliterated any structure to the head. T.542. As far as the cause of death, the medical examiner indicated "multiple trauma" because there were several injuries that killed Markel; the obvious one was the traumatic severing of his leg which caused hypobulimic shock and death. T.542-43.

The prosecution also introduced the testimony of a jailhouse informant, James Beck, Sr., who was housed next to petitioner for three days in early 2000. T.694-95. Beck testified that he

overheard Faeth"yelling back and forth" to another inmate, Ryan Laws. T.695. When Beck

"heard [petitioner] say he had to take a lie detector test," Beck "got of [sic] [his] bunk and went

over to listen." *Id.* Beck asked him, "You got to take a lie detector?" Faeth said, "yeah." Beck

testified, "He [i.e., Faeth] thinks he would have a hard time passing it, and at that time I said,

'Well, did you do it?' Well he had something to do with it, and at that time I went back and sat

down on my bunk and finished reading my book." T.696. According to Beck, Faeth told him that

"he was running off the tracks, and somebody caught him off the tracks out of breath and asked

him if he was okay, and I believe it was Stephanie Nesbitt, from what I heard." *Id.* Faeth also

told Beck that "him [sic] and another kid beat up the kid that dies on the tracks for the crack and

money." *Id.* Although Beck testified that Faeth was "yelling" about the lie detector test, Beck

stated that the conversation involving petitioner's admissions was "not loud for anybody else to

hear." T.697. Several days after this conversation, Beck was charged with having prison

contraband (a cigarette lighter) in his cell. While he was being transported to a court appearance,

he asked prison guards about who he should go to give a statement "regarding the murder on the

railroad tracks." T.698.

The defense called Sheila O'Connor, who was in jail for driving while intoxicated. She

stated that she did not know Faeth or any of the other witnesses, and that she killed the decedent

by hitting him with a brick while she was drunk. *See* T.722-26. Gregory Miller, another inmate,

testified that Ron Alessi had confessed to the killing. T.732-736. According to Miller, Alessi

spoke freely about the incident while in jail and said that he hit Markel on the head with

something and knocked him out. During one retelling of the story, Alessi allegedly said that he

moved man up to the railroad tracks with someone's help; another time, he said that he did not

move the victim.

The defense also called Dr. Robert Greendyke to counter the prosecution's medical expert. Dr. Greendyke testified that it was not possible to distinguish whether the decedent's injuries were caused by the train or other object. He also claimed that the presence of grease on the victim's body made it "a likelihood" and "certainly within the realm of possibility" that the star-shaped abrasion on the victim's came from the train. T.767-68. On cross-examination, the defense expert stated that he believed that "[a] portion of the locomotive could have" caused the stellate injury, although he stated that he did not have enough information to answer. T.768. Presented with a hypothetical based on the facts of the present case, Dr. Greendyke admitted that the front of the train "would have crushed the head." T.770. Dr. Greendyke testified that it was "[p]ossibly [sic] but unlikely" that a flashlight with batteries in it could have been used to inflect the star-shaped injury on the decedent's head.

The jury returned a verdict convicting petitioner of depraved indifference murder and robbery but acquitting him of intentional murder and felony murder. Faeth was sentenced to concurrent terms of imprisonment, the longer of which was 25 years to life. Faeth's conviction was affirmed on direct appeal, and his collateral motions attacking his convictions were unsuccessful. This timely habeas petition followed.

### III.  Discussion

#### A.    Standard of Review

Since this petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "which mandates deference to state court decisions," *Sellan v. Kuhlman*, 261 F.3d 303, 308 (2d Cir. 2001), petitioner must show that state court

decisions denying relief involved an objectively unreasonable application of clearly established federal law as determined by the Supreme Court, or resulted in an unreasonable determination of the facts in light of the evidence presented to the state courts. *Id.* at 308-14; 28 U.S.C. § 2254(d)(1), (2).

**B.       Analysis of the Amended Petition**

**1.       Ground One: "Ineffective Assistance of Counsel, Trial and Appellate"**

To establish a claim of violation of the Sixth Amendment right to the effective assistance of counsel, petitioner must satisfy the demanding two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687. The first prong requires showing that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that his representation fell below an objective standard of reasonableness. *Id.* at 687-88. To establish the second, "prejudice" prong, petitioner must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 687, 694. A "reasonable probability" in this context is one that undermines confidence in the outcome of the proceeding. *Id.* at 694.

**a.       Trial counsel's alleged ineffectiveness**

On direct appeal, Faeth was represented by new attorneys who asserted the claim of ineffective assistance of trial counsel.  The Appellate Division in denying this claim, held that "the evidence, the law, and the circumstances of [this] case, viewed in totality and as of the time

of the representation, reveal that" defendant received meaningful representation[.]" *People v. Faeth,* 298 A.D.2d 987, 989, 748 N.Y.S.2d 301, 303 (App. Div. 4th Dept. 2002) (citing *People v. Baldi*, 54 N.Y.2d 137, 147 (N.Y. 1981)). Faeth subsequently asserted various other claims of ineffective assistance of trial counsel in the context of a collateral motion to vacate the judgment under New York Criminal Procedure Law ("C.P.L.") § 440.10(1)(f), (h), which were denied by the trial court in a memorandum decision and order. *See* C.P.L. § 440.10 Order dated 1/27/2004, ¶3 (summarizing Faeth's allegations that "his trial attorney failed to challenge the facial sufficiency of the 'depraved indifference murder' count of the indictment, that he failed to investigate the crime scene and to interview witnesses, and that he deprived the defendant of his right to testify at trial through 'intimidation'").

In his amended habeas petition, Faeth asserts what appear to be essentially the same claims of error on the part of trial counsel that were raised in the C.P.L. § 440.10 motion, although reworked slightly. Faeth now contends that defense counsel's motion to dismiss the indictment was "premature" and argues that the motion "would never have persuaded anyone . . . ." Amend. Pet. at 5(a)(1). This appears to be in response to the C.P.L. § 440.10 court's finding that trial counsel was not ineffective in failing to challenge the facial sufficiency of the indictment on the depraved indifference murder count, because, "based on the evidence produced at trial, such a motion would merely have resulted in an amendment of the indictment, not a dismissal of the count." *Id.* A defendant cannot show that he was prejudiced by trial counsel's failure to make a non-meritorious motion.

Next, Faeth contends, in conclusory fashion, that "[i]neffective [sic] was also shown by counsel's unpreparedness for trial due to failure to investigate the people's witnesses and

stories." Amended Petition ("Amend. Pet.") at 5(a)(1)-5(a)(3) (Docket No. 29). As the trial court

determined, Faeth's "arguments regarding the effect of counsel's failure to view the scene and

interview witnesses are based on speculation and conjecture as to what, if any, impact such

efforts might have had on the jury[.]" C.P.L. § 440.10 Order dated 1/27/2004, ¶4. The trial court

further found that the two witness statements in support of this claim were "either collateral or

based on hearsay." *Id.* Faeth's "mere conjecture that [defense counsel] could have secured

[exculpatory, admissible] testimony had he only investigated further plainly is insufficient to

warrant habeas relief." *Johnson v. Artus*, No. 07 Civ. 5905(SAS)(FM), 2009 WL 763897, at *11

(S.D.N.Y. Feb. 20, 2009) (Report and Recommendation) (citing *Eisemann v. Herbert*, 401 F.3d

102, 108-09 (2d Cir. 2005) (speculation as to an uncalled witness' potential testimony is

insufficient to establish an ineffective assistance claim); *Maddox v. Lord*, 818 F.2d 1058, 1062

(2d. Cir.1987) (claim that defense counsel did not investigate prosecution's forensic evidence

fails to meet Strickland test absent any indication that the result would have been exculpatory);

*Muhammad v. Bennett*, No. 96 Civ. 8430(JSR)(HBP), 1998 WL 214884, at *1 (S.D.N.Y. Apr.

29, 1998) (petitioner's "speculative claim about the testimony of an uncalled witness is accorded

little weight in federal habeas review")).

        Faeth also complains about "[t]rial counsel's failure to protect the record. . . ." Amend.

Pet. at 5(a)(3), ¶13 (citations to record omitted). For instance, he contends that trial counsel

should have objected to "cocaine addicts testify[ing] as experts as to effects of crack cocaine,

[i]mpermissible reference to petitioner's polygraph, Ron Alessi's invocation of the Fifth

Amendment Right, hearsay as to what witness Mary Beuchat overheard, [and] hearsay

statements from Nesbitt and B. Hackett." *Id.* (citations to record omitted). Even if trial counsel

had objected, I find that there is no reasonable probability that the outcome of the trial would have been different. The reference to the polygraph was not erroneous since it was part of an admission by petitioner testified to by inmate Beck. The prosecution's chief witnesses, all of whom were drug users, did not testify as so-called "expert witnesses." The Appellate Division found that although Alessi was improperly allowed to invoke his Fifth Amendment privilege regarding an unrelated robbery, *see People v. Faeth*, 298 A.D.2d at 988, any error in failing to strike the testimony of the witness was harmless because in the instance in which the privilege was invoked, the matter related only to the witness's credibility and not to the facts surrounding the crimes with which defendant was charged. Moreover, the trial court properly instructed the jury, *id.* (citation omtted). As discussed below in the context of the alleged Confrontation Clause errors, Beuchat's testimony was not erroneous. In addition, Stephanie Nesbitt and Bobbe Hackett were properly allowed to testify regarding petitioner's inculpatory admissions to them; trial counsel had no basis for objecting on hearsay grounds.

Faeth has failed to establish that his trial attorney's performance, including any omissions that he may have made, was "outside the wide range of professionally competent assistance, evaluated from the perspective of counsel at the time and excluding the benefit of hindsight." *Strickland*, 466 U.S. at 694. There is a strong presumption that counsel's conduct falls within the range of reasonable decisions as judged by prevailing professional norms. *See id.* at 689-90. On this record, Faeth has failed to rebut that presumption. Most important, Faeth has not demonstrated that he was prejudiced by defense counsel's performance because he has failed to show a reasonable probability that, had counsel performed differently, the outcome of his trial would have been different. *See id*. at 694. Accordingly, Faeth has not established either prong of

-14-

*Strickland* and consequently is not entitled to habeas relief.

### b. Appellate counsel's alleged ineffectiveness

A claim for ineffective assistance of appellate counsel is evaluated upon the same standard as is a claim of ineffective assistance of trial counsel. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)), *cert. denied*, 508 U.S. 912 (1993)). A petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful. *Mayo,* 13 F.3d at 533-34; *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir. 2001). Notably, appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith,* 528 U.S. at 288 (citing *Jones v. Barnes,* 463 U.S. 745, 750-54 (1983)).

When Faeth asserted his claim of ineffective appellate counsel in his *coram nobis* application, it was summarily denied as without merit by the Appellate Division. Faeth's challenge to the adequacy of appellate counsel's performance amounts to nothing more than petitioner's unsubstantiated belief, based on hindsight following an unsuccessful appeal, that counsel somehow should have argued the issues "more persuasively." As the C.P.L. § 440.10 court noted, petitioner's "case was exhaustively briefed on direct appeal . . . by assigned counsel." C.P.L. § 440.10 Order dated 1/27/2004, ¶1. There is no basis for finding that appellate counsel's performance inadequate. Nor do petitioner's conclusory assertions concerning appellate counsel's performance provide any basis to conclude there is any reasonable

probability that the outcome of the appeal would have been favorable to Faeth had appellate counsel performed differently.

2.     **Ground Two: The due process violation*s* of the prosecution and law enforcement officers in the grand jury proceeding**

As his second ground for habeas relief, Faeth alleges various errors during the grand jury proceedings; for example, he contends that the prosecutor committed misconduct and suborned perjury from the sheriff's investigators who testified. None of the allegations in ground two provide a colorable basis for habeas relief.

As the Supreme Court explained in *United States v. Mechanik*, 475 U.S. 66 (1986), in the context of a federal grand jury proceeding, a petit jury's subsequent verdict of guilty transforms any defect in the earlier grand jury proceedings into harmless error by establishing both probable cause to indict the defendant and the defendant's guilt beyond a reasonable doubt of the charged crimes. *Mechanik*, 475 U.S. at 70. The Second Circuit has applied the Supreme Court's reasoning in *Mechanik* to claims by state prisoners collaterally challenging their convictions under 28 U.S.C. § 2254. *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir.1989). Noting that *Mechanik* held that federal grand jury rights are not cognizable on direct appeal when they have been rendered harmless by a petit jury's guilty verdict, the Second Circuit held that analogous claims regarding a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack on a state conviction brought in federal court. *Lopez*, 865 F.2d at 32. Ground Two, which alleges defects in the grand jury proceeding, is not cognizable on federal habeas review and is dismissed on that basis.

3.     **Ground Three: The constitutional vagueness of the New York's statutory distinction between reckless murder and depraved indifference murder**

In support of ground three, Faeth asserts that "New York's statutory distinction between reckless murder and depraved ind[ifference] murder is unconstitutionally vague and allows prosecutorial discrimination when choosing which crime to charge, denying [petitioner] due process and equal protection." Amend. Pet. at 6(c) (Docket No. 29). Faeth argues that "[t]he vagueness analysis used in Eighth Amendment death penalty cases applies by analogy to the sentence enhancement resulting from the distinction - - between "substantial risk" and "very substantial risk" creating an Eighth Amendment violation." Amend. Pet. at 6(c) (Docket No. 29). Faeth states that the "essential facts of this case could of [sic] led to a charge of Manslaughter instead of Murder in the Second Degree," *id.* Faeth points out that if he had been charged and convicted of reckless manslaughter instead of depraved indifference murder, his sentence would have been "substantially less." *Id.*

Thus, Faeth's argument "is not that the depraved indifference statute standing by itself is unconstitutionally vague," *Mannix v. Phillips*, 390 F. Supp.2d 280, 292 (S.D.N.Y. 2005), but "[r]ather, it is that the difference between it and the manslaughter statute is either indiscernible or non-existent and that the congruence between the two statutes renders his conviction constitutionally infirm," *id.* Essentially, Faeth is arguing that the lack of difference between the two statutes, which carry different punishments, allow for arbitrary prosecution. *Id.* However, "even assuming *arguendo* that there is no distinction at all between the conduct covered by the depraved indifference murder statute and the conduct covered by the manslaughter statute, there is no clearly established federal constitutional principle permitting this Court to grant habeas relief." *Mannix*, 390 F. Supp.2d at 292 (citing *United States v. Batchelder*, 442 U.S. 114, 116-17,

-17-

123-24 (1979)).[1]

The constitutional "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted). In *Batchelder*, the Seventh Circuit Court of Appeals had vacated the sentence of a felon convicted under a federal gun possession statute because there existed a different statute that criminalized identical conduct but that mandated a lesser sentence. *Batchelder*, 442 U.S. at 116-17. The Seventh Circuit reasoned that because a prosecutor's discretion to charge under either statute could produce "unequal justice," it was doubtful that "this form of legislative redundancy was constitutional." *Id.* at 124. The Supreme Court reversed, however, ruling that a defendant had "no constitutional right to elect which of two applicable . . . statutes shall be the basis of his indictment." *Id.* at 125. The Supreme Court noted that prosecutorial discretion was subject to constraints imposed by the equal protection clause, which prohibits selective enforcement " 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* at 125 n. 9 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

---

[1]    As the district court noted in *Mannix*, two district court cases have granted writs of habeas corpus under 28 U.S.C. § 2254 on vagueness grounds with respect to convictions for depraved indifference murder: *St. Helen v. Senkowski*, No. 02 Civ. 10248 (S.D.N.Y. Sept. 22, 2003) (CLB) (Docket # 21), and *Jones v. Keane*, 2002 U.S. Dist. LEXIS 27418 (S.D.N.Y. May 22, 2002) (CLB). Both decisions were reversed because the vagueness challenges had not been exhausted and were procedurally defaulted, and thus the Second Circuit did not consider the vagueness claims on the merits. *Mannix*, 390 F. Supp.2d at 289 n.1 (citing *St. Helen v. Senkowski*, 374 F.3d 181 (2d Cir.2004) (*per curiam*), *cert. denied*, 543 U.S. 1058 (2005); *Jones v. Keane*, 329 F.3d 290, 295-96 (2d Cir.), *cert. denied*, 540 U.S. 1046 (2003)).  The "overwhelming weight" of New York state court authority, and this Circuit's district court authority, holds that "New York's depraved indifference murder statute is not unconstitutionally vague and does not allow unlimited or arbitrary discretion in its application." *Rustici v. Phillips*, 497 F. Supp.2d 452, 481-82 (S.D.N.Y. 2007) (citing, *inter alia*, *Farr v. Greiner*, No. 01 CR 6921(NG)(MDG), 2007 WL 1094160, at *21-24 (E.D.N.Y. Apr. 10, 2007); *Guzman v. Greene*, 425 F. Supp.2d 298, 313 (E.D.N.Y. 2006); *Mannix*, 390 F. Supp.2d at 292; *People v. Johnson*, 87 N.Y.2d 357, 361 (N.Y. 1996); *People v. Cole*, 85 N.Y.2d 990, 992 (N.Y. 1995)).

In rejecting a claim essentially the same as that raised by Faeth here, the district court in *Mannix* noted, "*Batchelder* makes clear that where two separate statutes cover identical conduct, there is no constitutional infirmity in giving the prosecution discretion to choose which of the two statutes it wishes to use as a basis for a charge against a defendant, "'so long as it does not discriminate against any class of defendants.'" *Mannix*, 390 F. Supp.2d at 293 (quoting *Batchelder*, 442 U.S. at 123-24; citing *Pike v. Santucci*, No. CV-86-3832,1987 WL 6397, at *2-*3 (E.D.N.Y. Jan. 29, 1987) (stating that "[a]n overlapping statute can be attacked as violating equal protection only on the ground that a prosecution abused its discretion and discriminated against a class of defendants. Facial attacks of overlapping statutes are clearly without merit"; finding no constitutional infirmity even if two statutes with different punishments could be construed as reaching identical conduct); *United States v. Edmonson*, 792 F.2d 1492, 1497 (9th Cir.1986) ("When, as here, conduct violates more than one criminal statute the government may generally elect which statute it wishes to charge.") (citations omitted)).

Faeth has provided no evidence that the prosecution's decision to prosecute him for depraved indifference murder rather than reckless manslaughter stemmed from some impermissible consideration such as his race or religion, or some other arbitrary classification. *Mannix*, 390 F. Supp.2d at 293 (citing *Batchelder*, 442 U.S. at 123-24)). Thus, Faeth has not demonstrated a constitutional infirmity in his prosecution. *See id.* (holding that the state court did not unreasonably applied *Batchelder* or any other Supreme Court precedent in rejecting his vagueness challenge even though the two purportedly identical statutes (depraved indifference and reckless manslaughter) were presented to the trial jury; the instructions to the jury did not afford it discretion in choosing which charge to invoke against petitioner since jury was told that

if they found that the elements of depraved indifference murder charge had been proven, they "must not give any consideration" to the manslaughter charge").[2]

> ### 4. Ground Four: The claim that the evidence was legally insufficient to support the convictions for first degree (forcible) robbery and depraved indifference murder.

With regard to the first degree robbery conviction, Faeth contends that the prosecution did not adduce legally sufficient proof as to intent to take the victim's property. Amend. Pet. at 6(d)(1) (Docket No. 29). In connection with the depraved indifference conviction, Faeth argues that the element of recklessness was not proven beyond a reasonable doubt, and if any *mens rea* was demonstrated, it was "intent to kill" rather than "recklessness." *Id.* The Appellate Division held that Faeth's "conviction [was] supported by legally sufficient evidence" because "[t]here [was] a 'valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial . . . and as a matter of law satisfy the proof and burden requirements for every element of the crime charged[.]" People v. Faeth, 298 A.D.2d at 988 (quoting *People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987)). This conclusion was neither contrary to, nor an unreasonable application of, federal law.

---

[2]     The district court in *Jones v. Keane* concluded that "when two different statutes . . . reach the same conduct, or indistinguishable conduct, and one carries a far lesser penalty, allowing a grand jury to choose to indict for either one is a clear denial of equal protection," 2002 U.S. Dist. LEXIS 27418, at *12-*13. However, as the district court in *Mannix* pointed out, *Jones* "gives no citation for its conclusion." *Mannix*, 390 F. Supp.2d at 293 n. 2. Similarly, the district court in *St. Helen v. Senkowski* "concluded that '[t]he Supreme Court learning [sic] clearly reflects that the Equal Protection and Due Process Clauses of the Fourteenth Amendment prevent two penal statutes from reaching indistinguishable conduct, where one statute carries a far lesser penalty than the other.'" 390 F. Supp.2d at 293 n.2 (citing *Jones*, No. 02 Civ. 10248, at 17-18) (and citing *Kolender*'s requirement that the legislature not define crimes in such a way so as to encourage "arbitrary and discriminatory" enforcement)). However, I agree with the district court's analysis and conclusion in *Mannix*, 390 F. Supp.2d at 290-92, that this aspect of *Kolender* is satisfied with respect to the depraved indifference statute taken on its own, *id.* As *Mannix* points out, the district court opinions in *Jones* and *St. Helen* are inconsistent with the Supreme Court's decision in *Batchelder* (which was not cited in either *Jones* or *St. Helen*). I agree with the district court in *Mannix* that for this reason, I must respectfully decline to follow them in reviewing Faeth's federal habeas petition. *Id.* at 293 n.2.

### a.     Legal Principles

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Thus, under federal law or New York state law, review of the legal sufficiency of trial evidence is governed by the same standard; the test is not whether the jury could have come to some other conclusion, but rather whether the evidence could persuade *any* rational jury (or fact-finder) that all the essential elements of the crime were proven beyond a reasonable doubt. *Id.*; *see also People v. Bleakley*, 69 N.Y.2d at 495. As the Second Circuit has explained,

> [T]he standard for appellate review of an insufficiency claim places a "very heavy burden" on the appellant. Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt. In making this determination, we must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor.

*United States v. Carson*, 702 F.2d 351, 361 (2d Cir.1983) (citations omitted), *cert. denied*, 462 U.S. 1108 (1983). Under both state and federal law, the credibility of the witnesses is always a question of fact for the jury, and that determination is accorded great weight by the reviewing court.

On habeas review, the *Jackson v. Virginia* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16; *accord*, *e.g.*, *Green v. Abrams*, 984 F.2d 41, 44-45 (2d Cir.1993) ("In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the

elements of the crime.").

### a. Sufficiency of the evidence supporting first degree robbery conviction

Faeth was convicted under N.Y. Penal Law § 160.15(1),which provides that "[a] person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: 1. Causes serious physical injury to any person who is not a participant in the crime[.]" N.Y. PENAL LAW § 160.15(1). Under New York Penal Law § 160.00, robbery is defined as follows:

> Robbery is forcible stealing. A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of:
>
> 1.      Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or
>
> 2.      Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.

N.Y. PENAL LAW § 160.00(1), (2). Proof of intent requires "evidence that, in using or threatening physical force, defendant's 'conscious objective' was either to compel his victim to deliver up the property or to prevent or overcome resistance to the taking." *People v. Smith*, 79 N.Y.2d 309, 315 (N.Y. 1992) (quotation omitted); *see also People v. Joyner*, 26 N.Y.2d 106, 109 (N.Y. 1970) (defendant could not be convicted of felony murder if his "intent to commit the [underlying] felony, robbery . . . came into being after the defendant had killed his victim"). Faeth argues that there "was no proof the petitioner confronted the victim with the intent to take his property." Amend. Pet. at 6.d.1 (Docket No. 29).

There was ample evidence from which the jury could have inferred that petitioner

decided to rob the decedent at an earlier time and used physical force in execution of that crime. The proof showed that the victim was alive at the time he was discovered on the railroad tracks. The victim sustained a star-shaped injury to the victim's skull which, in the medical examiner' opinion, was caused by blunt trauma inflicted, for example, with a stick; the head injury was not the result of the victim being struck by the train (Tr. 540-542). The medical evidence was more than sufficient to permit a rational juror to conclude that the victim was still alive when petitioner decided to rob him, and that petitioner struck him with some type of object (perhaps a beer bottle or the edge of a stick), causing traumatic head injuries and rendering him unconscious.

There was also evidence from which the jury could have inferred that Faeth intended to rob the victim of his drugs and money. For instance, when Ronald Alessi and the victim had smoked marijuana together that night, Alessi saw that the victim had cash in the form of twenty-dollar bills. Alessi also observed how the victim had his drugs packaged, T.331-32, and saw petitioner talking to the victim, T.335. Soon after Alessi observed petitioner and the victim together, he saw that petitioner had marijuana packaged in bags similar to the ones he had seen in the victim's possession, which were different from the bags petitioner had earlier. T.337-38). Petitioner also had several twenty dollar bills, which he had not had earlier. T.340. When the victim was found, he had no twenty-dollar bills and no drugs on his person.

Bobbe Hackett also saw petitioner and the victim together, and testified that the two were arguing. T.380-81. Later, after Bobbe and the others learned the victim had been run over by the train, petitioner immediately wanted to leave the area. Bobbe Hackett testified that petitioner actively prevented her and their other companions from going up to the railroad tracks.

T.388-89. When she asked petitioner why he did not want her to go the site of the death, he said "You didn't need to see what I did back there." *Id.*

Petitioner also made admissions, amounting to a confession, to both his girlfriend, Stephanie Nesbitt, T.218-19, 222, and fellow inmate James Beck, T.696-97.

Even if the jury accepted that petitioner did not go into the woods that evening planning to commit robbery, a rational juror still could conclude from the evidence that petitioner decided to seize the opportunity to steal the decedent's drugs and cash at some point during their last encounter.

### b. Sufficiency of the evidence supporting depraved indifference murder conviction

Faeth states that "[t]he present statute [sic] defines the crime, (Depraved Indifference Murder), by reference to the circumstances under which it occurs, and expressly states that 'recklessness' is the element of mental culpability required." Amend. Pet. at 6(d)(1) (Docket No. 29). He contends that "the only evidence linking petitioner to [the] crime, was an alleged admission to a witness, stating, "I killed him", and, "I killed the happy guy", which, he argues "show[] nothing by itself of petitioner's mind set, at the time of the killing." *Id.*

Under New York's Penal Law, "[a] person is guilty of murder in the second degree when . . . [u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. PENAL LAW § 125.25(2). A person is guilty of manslaughter in the second degree when he "recklessly causes the death of another person." N.Y. PENAL LAW § 125.15(1). A person is said to act recklessly with regard to a particular result or to a circumstance "when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will

occur or that such circumstance exists." N.Y. PENAL LAW § 15.05(3). "The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*, § 15.03.

At the time of Faeth's conviction, the controlling New York Court of Appeals case regarding the interpretation of P.L. § 125.25(2), the depraved indifference murder statute, was *People v. Register*, 60 N.Y.2d 270 (N.Y. 1983), *cert. denied*, 466 U.S. 953 (1984), *overruled by People v. Feingold*, 7 N.Y.3d 288 (N.Y. 2006). *Register* distinguished depraved indifference from both intentional murder and reckless manslaughter. *See id.* at 277 (holding that "recklessness is the element of mental culpability required" in the depraved indifference statute and thus "the focus of the offense is not upon the subjective intent of the defendant, as it is with intentional murder, but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct"). As Faeth correctly notes, "recklessness was the culpable mental state for depraved indifference murder" at the time of his conviction. *Rustici v. Phillips*, 497 F. Supp.2d at 484 (citing, *inter alia*, *People v. Register*, 60 N.Y.2d at 274). *People v. Register* held that New York Penal Law § 125.25(2)'s requirement that the offense occur "'under circumstances evincing a depraved indifference to human life' . . . refers to neither the *mens rea* nor the *actus reus*" but rather to "the factual setting in which the risk creating conduct must occur, [which are] objective circumstances . . . ." *Id.* at 276. Although, as *Register* recognized, depraved indifference murder "resembles" reckless manslaughter, the difference between the statutes is based upon the different factual circumstances under which each crime is committed.

*Mannix v. Phillips*, 390 F. Supp.2d at 292 (citing *People v. Register*, 60 N.Y.2d at274).[3] Stated

another way, under *Register* and its progeny, "[t]he depravity and indifference of the crime was

assessed objectively based on a review of the circumstances constituting the offense." *Rustici*,

497 F. Supp.2d at 484 (citing *People v. Sanchez*, 98 N.Y.2d 373, 381, 82 (N.Y. 2002)

(reaffirming *Register* and stating that it is the "defendant's disregard of the risk [which] elevates

and magnifies the degree of recklessness, itself establishing the required circumstances evincing

depraved indifference to human life"), *overruled by People v. Feingold*, 7 N.Y.3d 288 (N.Y.

2006); *People v. Register*, 60 N.Y.2d at 274)).[4]

     Under the controlling law in New York at the time of petitioner's conviction,  the

evidence was sufficient to convince a rational jury that he was guilty of murder under theory of

depraved indifference. In particular, there was compelling circumstantial evidence from which

the jury could have inferred that petitioner brutally beat the victim into an unconscious state and

then left him, helpless but still alive, on a railroad train tracks that were in active use. The

---

[3]    The *Register* court attributed the resemblance between reckless manslaughter and depraved indifference murder to "an inability to quantify homicidal risks in precise terms" which led "the Legislature [to] structure[ ] the degree of risk which must be present in nonintentional killings by providing that in a depraved mind murder the actor's conduct must present a grave risk of death whereas in manslaughter it presents the lesser substantial risk of death."  60 N.Y.2d at 277.

[4]    Beginning in 2003 with its decision in *People v. Hafeez*, 100 N.Y.2d 2531060 (2003), the New York Court of Appeals began incrementally restricting the circumstances under which a defendant could be found guilty of depraved indifference murder. *Rustici,* 497 F. Supp.2d at 484 (citing *People v. Feingold*, 7 N.Y.2d at 290-94, *People v. Gonzalez*, 1 N.Y.3d 464 (N.Y. 2004); *People v. Payne*, 3 N.Y.3d 266 (N.Y. 2004); *People v. Suarez*, 6 N.Y.3d 202, 211-12 (N.Y. 2005) ("[S]omeone who intends to cause serious physical injury does not commit depraved indifference murder because the intended victim dies. . . . Thus, one who acts with the conscious intent to cause serious injury, and who succeeds in doing so, is guilty only of manslaughter in the first degree. Otherwise, every intentional manslaughter would also establish depraved indifference murder-a result plainly at odds with the discrete classifications set forth in the statute. Since a defendant who intends to injure or kill a particular person cannot generally be said to be "indifferent"–depravedly or otherwise–to the fate of that person, we underscore what we said in *Payne*: "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder.")).  Recognizing that the *Register* rule had been seriously eroded by its recent decisions, the Court of Appeals overruled *Sanchez* and *Register* in *Feingold*, and held that "depraved indifference is a culpable mental state." *Feingold*, 7 N.Y.3d at 294.*Feingold*'s holding has resulted in a more limited application of the depraved indifference murder statute in New York. *Rustici*, 497 F .Supp.2d at 485 (citations omitted).

medical evidence showed that the victim died after being struck by a train, suffering the complete severance of his leg, and going into shock occasioned by the traumatic loss of blood. Under the circumstances viewed objectively, it was not unreasonable for the jury to conclude "defendant's conduct and brutality 'presented a very high risk of death', indicating a 'wonton indifference to human life, [and] a deprav[ed] mind'," *People v. Porr*, 160 A.D.2d 507, 554 N.Y.S.2d 169, 170 (App. Div. 1st Dept. 1990) (sustaining conviction for depraved mind murder where defendant gouged the partially disrobed victim in the groin area with a stick, beat her about her head and body with a branch-like object, tossed her down a steep seventeen foot railroad embankment, causing her head to strike the tracks, and left her there, unconscious and bleeding; the victim suffered brain death as a consequence of multiple head wounds) (quoting *Register*, 60 N.Y.2d at 274)); *see also People v. Kibbe*, 35 N.Y.2d 407 (N.Y. 1974) (finding that the defendants were properly convicted of depraved indifference murder after they robbed an intoxicated victim and forced him out of a car on the side of a dark, remote, snowy road, partially dressed and without shoes in subfreezing temperatures, where he was struck by a passing truck and killed); *People v. Chirse*, 2007 WL 852053, at *2 (N.Y. Sup Ct. Mar. 12, 2007) (citing *People v. Kibbe* and noting that under *Register*, the Court of Appeals has recognized that depraved indifference murder "can be found in certain unintentional killings directed at a single individual" where "defendant intends to neither seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die, the defendant's utter callousness to the victim's moral plight – arising from a situation created by the defendant – properly establishes depraved indifference murder").

Faeth also contends that his other alleged admission, that he "killed the victim, 'because

he saw petitioner make a drug deal'," Amend. Pet. at 6(d)(1), negates a finding of recklessness.

Petitioner argues that "having a 'reason' to kill somebody, <u>clearly shows intent</u>." Amend. Pet. at

6(d)(1)(Docket No. 29) (emphasis in original). Thus, he argues, the jury's verdict convicting him

of depraved indifference murder, which is not a crime of intent, was based upon legally

insufficient evidence. *See id.*

  Here, the jury was charged with both depraved indifference and intentional murder.

Faeth's argument seems to be based on a line of cases in New York that addressed the problem

of juries returning guilty verdicts on *both* depraved indifference and intentional murder counts.

For instance, in *People v. Gallagher*, 69 N.Y.2d 525 (N.Y. 1987), the New York Court of

Appeals clarified that an "act is either intended or not intended; it cannot simultaneously be

both." *Id.* at 529 (holding that "[o]ne who acts intentionally in shooting a person to death–that

is, with the conscious objective of bringing about that result–cannot at the same time act

recklessly–that is, with conscious disregard of a substantial and unjustifiable risk that such a

result will occur") (citations omitted). Here, in contrast to *People v. Gallagher*, 69 N.Y.2d at

529, the jury, although charged with murder under both intentional and depraved indifference

theories, *acquitted* Faeth of intentional murder.

  In any event, under the law governing depraved indifference at the time of Faeth's

conviction, Faeth's alleged admission that he killed the victim because the victim saw him make

a drug deal does not invalidate the jury's guilty verdict on the depraved indifference charge. *See*,

*e.g.*, *People v. Register*, 60 N.Y.2d 2d at 273-75  Although Faeth asserted that he intended to,

and did accomplish, the killing of the victim, the medical evidence and eyewitness testimony

showed that the still was alive at the time Faeth placed his body on the railroad tracks. Moreover,

the jury was not required to accept petitioner's version of events. *E.g.*, *People v. Frazier*, 86 A.D.2d 557, 559, 446 N.Y.S.2d 287, 290 (App. Div. 1st Dept. 1982) ("[T]he jury has the right to believe portions of both the defense and prosecution evidence."); *see also Rustici v. Phillips*, 497 F. Supp.2d at 483 ("On the other hand, the jury was free to reject Rustici's version of an accidental discharge of the gun and believe that, although he purposefully shot Behr, the petitioner did not intend to cause his death. This also was sufficient to convict him of depraved indifference murder.") (citing, *inter alia*, *People v. Sanchez*, 98 N.Y.2d at 375-76); see also Romano v. Howarth, 998 F.2d 101, 107 (2d Cir. 1993) (rejecting notion that "jury had to accept the plaintiff's testimony in its entirety, or the defendants' testimony in its entirety, in order to resolve this dispute"; "the truth, however, may, and often does, lie somewhere in between the divergent accounts; the jury's discretion to explore the middle ground should have remained unfettered"; "the jury could have rejected the [prison guards'] version that no force was used, but also have rejected many of the details described by [the inmate]").

The Court is cognizant of the significant developments in New York regarding the law of depraved indifference murder and the legal sufficiency of evidence supporting such a claim in recent years, *see Rustici*, 497 F. Supp.2d at 484 (citing, *inter alia*, *People v. Feingold*, 7 N.Y.2d at 288)). However, the law in New York as stated in *Register* and *Sanchez* was controlling at the time of the petitioner's conviction in 2000, *see id.* at 486 (citing *Policano v. Herbert*, 7 N.Y.2d 588, 603 (N.Y. 2006)), and the Court finds that the evidence was sufficient under New York law at that time to convict the petitioner of depraved indifference murder. Accordingly, his challenge to the sufficiency of the evidence is denied.

**5.      Ground Five: Repugnancy of the guilty verdict of robbery and the acquittal of felony murder**

As his fifth ground for relief, Faeth asserts that the verdict convicting him of first degree robbery was repugnant to and inconsistent with verdict acquitting him of felony murder. Faeth notes that the trial court charged the jury that "if you find the defendant murdered the victim in the commission of a Robbery, you must find him guilty of Felony Murder." Amended Petition at 6-e (Docket No. 29). Faeth argues that there is "no rational theory as to why the Jury found him guilty of Robbery, yet not guilty of Felony Murder." *Id.* Therefore, Faeth asserts, he "is in custody in [v]iolation of the Constitution." *Id.*

Faeth has asserted neither an error of New York State law nor an error of Federal constitutional magnitude. First, courts in New York have held that as a matter of New York law, "[t]he crimes of felony murder and robbery in the first degree do not have the same basic elements and the guilty verdict on the robbery charge is not repugnant to the not guilty verdict on the felony murder charge[.]" *People v. Russell*, 73 A.D.2d 791, 792, 423 N.Y.S.2d 709, 711 (App. Div. 4th Dept. 1979) (citing *People v. Delorio*, 33 A.D.2d 350, 353, 308 N.Y.S.2d 131, 134-35 (App. Div. 3d Dept. 1970)).

Second, it has long been established as a matter of Federal constitutional law that mere inconsistency between jury verdicts is not a ground for reversal of the guilty verdict. *E.g.*, *Dunn v. United States*, 284 U.S. 390, 393 (1932) ("Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. . . ."); *accord United States v. Powell*, 469 U.S. 57, 65 (1984) (citing *Harris v. Rivera*, 454 U.S. 339, 346 ("again reaffirm[ing] the *Dunn* rule in the course of holding that a defendant could not obtain relief by writ of habeas corpus on the basis of inconsistent verdicts rendered after a state bench trial" and noting that "*Dunn* and *Dotterweich* establish 'the unreviewable power of a jury to return a

verdict of not guilty for impermissible reasons."); *Standefer v. United States*, 447 U.S. 10, 22-23 (1980)); *see also United States v. Chang An-Lo*, 851 F.2d 547, 559-60 (2d Cir.1988) (holding that *Dunn*, *Powell* and *Harris* "clearly preclude the challenges presented here as to the alleged inconsistency of the verdicts reached by the jury in this case," and that "[e]ven assuming that some of the verdicts are inconsistent, which is less than certain where the allegedly inconsistent acquittals occur on RICO counts implicating the special and distinct requirements of that statute, there is no basis for reversal of the assertedly offensive guilty verdicts").

As long as a conviction is the result of a fair trial at which legally sufficient evidence has been adduced, its inconsistency with another verdict does not create a constitutional defect." *Billups v. Costello*, No. 91 Civ. 6296 (LBS), 1992 WL 170650, *4 (S.D.N.Y. July 6, 1992) (citing *Harris v. Rivera*, 454 U.S. at 344 ("Apart from the acquittal of Robinson, this record discloses no constitutional error. Even assuming that this acquittal was logically inconsistent with the conviction of respondent, respondent, who was found guilty beyond a reasonable doubt after a fair trial, has no constitutional ground to complain that Robinson was acquitted."); *Powell*, 469 U.S. at 67 ("Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury

could rationally have reached a verdict of guilty beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.").

As discussed in this Decision and Order, *supra*, Faeth's attack on the sufficiency of the evidence underlying his conviction is not meritorious. Furthermore, the repugnancy argument does not stem from allegedly unfair trial procedures. As such, this ground of the petition fails to present a cognizable issue for review and is dismissed. *Accord*, *e.g.*, *Billups v. Costello*, 1992 WL 170650, at *4.

### 6. Ground Six: Violation of petitioner's Sixth Amendment Confrontation Clause rights by introduction of hearsay evidence

Faeth claims that "'[t]estimonial [e]vidence' was either offered by witnesses or elicited by the Prosecutor without the opportunity for [the defense] to review or examine it's [sic] reliability, now violating, Faeth's Right to Confront his accusers, and, the Confrontation Clause within the Sixth Amendment," contrary to the Supreme Court's holding in *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004) ("Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."). Petitioner's Supplemental Memorandum of Law, attached to the Amended Petition ("Pet'r Supp. Mem.") at 6; *see generally id.* at 1-6; *see also* Amend. Pet. at 6(f)(1)-6(f)(5). The alleged errors occurred during the testimony of Investigator Hetzke, who investigated the crime scene; and of Mary Beuchat, who was working at the convenience store and saw petitioner the morning of the murder. Faeth also argues that the prosecutor violated his right to confrontation "misstating facts in evidence" during summation. According to petitioner, the error was not harmless, because without the testimony "supported by unpresented

accusers . . . "[t]he Prosecution is left with nothing to link Faeth to [the] crime." *Id.* at 6; *see also id.* at 6-8.

### a.      The alleged Confrontation Clause errors

### 1.      Investigator Hetzke/Investigator Ameele

Petitioner contends that Investigator Hetzke "implied [his] guilt to the Jury through evidence of a possible weapon, Faeth's yellow flashlight, being seen by [Investigator] Ameele at the crime scene although Hetzke stated he was unsure if it was recovered." Amend. Pet. at 6(f)(1), 6(f)(2) (citing T.660, 661). Petitioner states that "[n]o such evidence of a yellow flashlight was ever recovered, although it was implied one was seen by an unpresented accuser," i.e., Investigator Ameele. *Id.* The C.P.L. § 440.10 court found that there was no Confrontation Clause error under *Crawford* because Investigator Ameele testified at trial. However, as petitioner points out, this is not correct. Amend. Pet. at 6(f)(1) (Docket No. 29). Investigator Ameele did testify at the grand jury and confirm that Investigator Hetzke recovered the flashlight; however, Investigator Ameele is not listed on the trial witness list and he did *not* testify at trial. *Id.* (citations omitted) (Docket No. 29). Although I agree with petitioner that the C.P.L. § 440.10 court erred in finding that he had the opportunity to confront Investigator Ameele at trial, I do not find that habeas relief is warranted this claim

The testimony about which petitioner complains was elicited during defense counsel's cross-examination of Inv. Hetzke regarding the flashlight parts he had found:

Q      What color was that flashlight?
A      It is a dark, well, the head of the flashlight, what I found was a dark, what
         I would say either green or black rubberized type of material.
Q      Any yellow on it, on the head?
A      No.
Q      Did you ever recover a yellow flashlight?

| | |
|---|---|
| A | I believe Investigator Ameele, I don't know if he recovered it but I know he saw a yellow flashlight. |
| Q | During your search did you find a yellow flashlight? |
| A | No, sir. |
| . . . | |
| Q | Did you secure, or to your knowledge was there secured any other flashlight as part of your investigation at the festival? |
| A | *No other flashlights were submitted in evidence*, no sir. |

T.660-61 (emphasis supplied). [lack of personal knowledge; then a hearsay objection] Petitioner was alleged to have been carrying a black and yellow flashlight when he went into the woods. Defense counsel's strategy in questioning Inv. Hetzke was to show that the police did not recover any parts of a yellow flashlight in their search of the crime scene. Although Inv. Hetzke at first stated that he purportedly knew that Inv. Ameele "saw" a yellow flashlight, defense counsel's further questioning forced an admission from Hetzke that there were no other flashlights found besides the black or green one. Moreover, no objection was ever lodged against Inv. Hetzke's testimony concerning what Inv. Ameele saw, either on the basis of a lack of personal knowledge or on hearsay grounds. To the extent that Faeth argues that Investigator Hetzke's testimony about what Ameele said to him was improper hearsay, the Court agrees. However, any error was harmless, as discussed further below.

### 2. Mary Beuchat/Nancy Heckman

Petitioner's second Confrontation Clause error allegedly occurred when Mary Beuchat "implie[d] Faeth's guilt to the Jury with testimonial evidence from an unpresented accuser, Nancy Heckman . . . ." Amend. Pet. at 6(f)(2)-6(f)(3) (Docket No. 29). Beuchat testified that petitioner and Nesbitt came into the convenience store on the morning that the victim's body was found. Beuchat was working with Heckman at the time.

| | |
|---|---|
| Q | Did you hear [petitioner] ask another clerk a question about a person? |

| | |
|---|---|
| A | Yes, I did. |
| Q | Tell the Jury what you recall him saying. |
| A | I remember him asking the night clerk, Nancy Heckman, if she had seen a guy named Randolph in the store. |
| Q | And then what did he say? |
| A | He stated that Randolph went for a walk earlier, and they hadn't seen him since earlier in the evening. |
| Q | And do you recall what the Clerk said to Mr. Faeth when he asked that question? |
| A | Yes, I do. |
| Q | What did she say? |
| A | She had not, she didn't know Randolph, and she proceeded to ask me if I knew him, and I didn't know no Randolph. I didn't see anybody in the store that I didn't know. |

T.590-91. Petitioner contends that Beuchat's "citing [of] Heckman's partial conversation with Faeth" and "then also citing what Heckman says to Beuchat is placed before the Jury in order to imply Faeth's guilt, with no opportunity to examine Heckman, in violation of the confrontation clause . . . ." Amend. Pet. at 6(f)(3) (Docket No. 29). Beuchat's testimony about what she heard petitioner ask Heckman (i.e., if she had seen someone named Randolph) was not hearsay. A party's own statements are admissible as non-hearsay admissions regardless of whether such statements were against his interest when made. FED. R. EVID. 801(d)(2); *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980). Beuchat's repetition of what Heckman said to petitioner also arguably was not hearsay because it was not being offered for the truth of the matter asserted, but only for the purpose of answering petitioner's inquiry and because Heckman's lack of knowledge of Randolph or his whereabouts had no relevance to the issues in the case.

However, assuming it was hearsay, it was not harmful to the defense case, and, notably, trial counsel did not object. Petitioner does not explain how cross-examining Heckman would have assisted the defense. I note that trial counsel properly and vigorously cross-examined

Beuchat about why she should have remembered this particular conversation. In particular, he implied that Beuchat had made up the conversation after hearing or reading about the murder; he asked her if she had told the police investigator that the reason the conversation was important in her mind was because she had heard media reports of the incident mentioning Randolph Markel's name. T.595. Trial counsel was able to elicit from Beuchat that she was not directly involved in the above-quoted conversation between Heckman and petitioner about Randolph. T.593.

### 3. The prosecutor as unsworn witness

Petitioner contends that his right to confrontation was violated because the prosecutor misstated facts in evidence, thereby acting as an unsworn witness not available for cross-examination. Amend. Pet. at 6(f)(4) (Docket No. 29). In particular, petitioner complains that the prosecutor stated that "There was no blood trace evidence found at the scene because the victim had long hair. That the long hair soaked up any blood, [and] then [he] showed the victims [sic] picture of long hair to the jury[.]" *Id.* (citation to record omitted). I appreciate the novelty of characterizing this claim as one involving confrontation clause rights, but Faeth is effectively alleging is that the prosecutor committed misconduct.

Prosecutorial misconduct for comments made in summation is grounds for reversal only when the remarks caused "actual prejudice" by infecting the trial with unfairness. *See Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir.1998). In the absence of evidence of prosecutorial misconduct, constitutional prejudice cannot be demonstrated. *See id.*

Petitioner is correct that "it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence." *United States v. Rosa*, 17 F.3d 1531, 1548-49 (2d

Cir.1994). However, a prosecutor "may argue all reasonable inferences from evidence in the record." *United States v. Young*, 470 U.S. 1, 8 n.5 (1985) (quotation omitted); *see also Darden v. Wainwright*, 477 U.S. 168, 182-83 (1986)."A prosecutor does not commit misconduct if he merely presents 'one view of the evidence, which the jury could accept or reject based on its own knowledge and judgment of the entire record.'" *Dunn v. Sears*, 561 F. Supp.2d 444, 456 (S.D.N.Y. 2008) (quoting *United States v. Hawkins*, Nos. 02-1783, 03-1076, 03-1115, 03-1078, 03-1153, 2005 WL 607990,125 Fed. Appx. 364, 366 (2d Cir. Mar. 16, 2005) (unpublished opn.) (holding that prosecutor's characterization of the record during summation did not constitute prosecutorial misconduct, in prosecution for health care fraud, mail care fraud, and conspiracy to commit such offenses, where prosecutor's description of the record was factually accurate and her remarks presented one view of the evidence, which the jury could either accept or reject.). Here, the prosecutor's proffered explanation for the absence of blood at the crime scene was fair argument based upon the evidence admitted at trial, and the prosecutor's description of the record was factually accurate. Thus, contrary to petitioner's contention, the challenged remark did not constitute misconduct.

### b.  Whether *Crawford* applies

As an initial matter, to the extent that petitioner claims a *Crawford* violation, any such claim must be dismissed because the Supreme Court has clearly held that the new rule announced in *Crawford* does not apply retroactively to cases on federal habeas review *Whorton v. Bockting*, 549 U.S. 406, 417-21 (2007); *accord*, *e.g.*, *United States v. Becker*, 502 F.3d 122, 129 (2d Cir. 2007). Second, even in *Crawford* did apply, there were no Confrontation Clause violations since none of the allegedly improper statements were "testimonial" in nature. *See*

*Crawford*, 541 U.S. at 51-52 (identifying "testimonial statements" to include "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (internal quotation marks and citations omitted) (cited in *United States v. Williams*, 506 F.3d 151, 156-57 (2d Cir. 2007)). The Second Circuit explained in *Williams*, "[i]t is plain from *Davis*[ *v. Washington*, 547 U.S. 813 (2006), which clarified *Crawford*], "that the right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements." 506 F.3d at 156-57 (quoting *United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006)).

### c.      Harmlessness of any evidentiary errors

As discussed above, the prosecutor did not "offer testimony" and did not commit misconduct. Also as noted above, the testimony provided by Mary Beuchat about which Faeth complains arguably was not hearsay at all. With regard to the testimony offered by Investigator Hetzke, even assuming it was erroneous and should have been objected to and excluded, any error was harmless. The evidence of Faeth's guilt, although in large part circumstantial, was overwhelming–even taking into consideration the fact that the prosecution did not recover a weapon that they could link definitively to the crime. Given the strength of the evidence showing that Faeth was culpable for the victim's violent end, the Court's confidence in the guilty verdict conclusion is not undermined by any of the errors alleged by Faeth in this ground of the petition, whether they are considered singly or together. After measuring this case against the most stringent harmless error standard, *see Chapman v. California*, 386 U.S. 18, 24 (1967), this Court

is convinced beyond a reasonable doubt that the alleged errors were harmless and that they did not affect the jury's determination of guilt.

IV.     **Conclusion**

For the foregoing reasons, petitioner Christopher Faeth's petition for a writ of habeas corpus is denied. As petitioner has not made "a substantial showing of the denial of constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        July 7, 2009
             Buffalo, New York.